# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

DONALD J. DELANGHE, as trustee of the
Trust Agreement of Donald J. DeLanghe,
and TERESA M. DELANGHE, as trustee of
the Trust Agreement of Teresa M. DeLanghe,

        Plaintiffs,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 13-3429 (MJD/TNL)

ARCHER DANIELS MIDLAND
COMPANY,

        Defendant.

Benjamin J. Hamborg and Court J. Anderson, Henson & Efron, P.A., Counsel for
Plaintiffs.

John M. Sheran and Curtis D. Ripley, Stinson Leonard Street LLP, Counsel for
Defendant.

## I.    INTRODUCTION

This matter is before the Court on the parties' cross motions for summary

judgment [Docket Nos. 21, 26] and on Defendant's Motion to Supplement

[Docket No. 46].  Because the Well Agreement is unambiguous, the Court denies

1

Defendant's motion and grants Plaintiffs' motion as to liability, but denies their

motion as to damages.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Drilling of Wells 1 and 2

Donald DeLanghe ("DeLanghe") and Teresa DeLanghe are a married

couple who own, live on, and operate a farm near Marshall, Minnesota.  (Compl.

¶ 6; Answer ¶ 6.)

In 1993, DeLanghe was a member of Minnesota Corn Processors ("MCP"),

a Minnesota Cooperative Association, and served on MCP's board of directors.

(Ripley Aff., Ex. 1, DeLanghe Dep. 24-25; DeLanghe Aff. ¶ 3.)  At that time, MCP

operated a corn wet-milling processing plant near the DeLanghes' farm, which

required a constant source of water.  (DeLanghe Aff. ¶ 3.)  MCP sought to

expand its ethanol-producing capacity, so, with the DeLanghes' permission,

MCP drilled test wells on the DeLanghes' property and confirmed that they had

a useable water aquifer.  (DeLanghe Aff. ¶ 4.)  DeLanghe and MCP then orally

agreed that MCP could drill two wells on the DeLanghes' land in exchange for a

one-time payment of $20,000.  (DeLanghe Aff. ¶ 4.)

In 1991 and 1992, MCP drilled two wells on the DeLanghes' land ("Wells 1 and 2") on two separate well sites.  (DeLanghe Aff. ¶ 5; Ripley Aff., Ex. 4, Nelson Dep. 17-18.)  At first, the water from the wells was not pumped directly to MCP's plant.  (Ripley Aff., Ex. 4, Nelson Dep. 49.)  The plant did not have a pipeline to connect to the wells, so the water was sent to Marshall Municipal Utilities ("MMU"), and then, from MMU to the plant.  (Id. 48-49; Ripley Aff., Ex. 1, DeLanghe Dep. 101.)  Later, in the mid-1990s, MCP installed a pipeline that connected its plant directly to Wells 1 and 2.  (Ripley Aff., Ex. 4, Nelson Dep. 49; Ripley Aff., Ex. 3, Pasquariello Dep. 37; Ripley Aff., Ex. 1, DeLanghe Dep. 101.)  The DeLanghes occasionally draw water from the pipeline, without cost to them, for use on their farm.  (Ripley Aff., Ex. 1, DeLanghe Dep. 96-100.)

After the wells were drilled, DeLanghe met with MCP's attorney, Brian Murphy, to negotiate the written agreement.  (DeLanghe Aff. ¶ 5.)

### 2.    Well Agreement

On March 28, 1995, MCP and the DeLanghes executed the written contract for Wells 1 and 2 ("Well Agreement").  (Ripley Aff., Ex. 5.)  The Well Agreement provides that, as "consideration of the use of said well sites," MCP gave $20,000.00 to the DeLanghes.  (Well Agreement at ¶ 1.)  It further provides:

Discontinuance of Operation. MCP does hereby agree that if at any time these wells become non-operational, that MCP at there [sic] expense shall close said well according to Minnesota Statutes and regulations in existence at the time of the closure, and remove any and all structures from the well site. Upon removal, all use of the property described in the well sites shall revert to DeLanghes.

(Id. ¶ 3.)

Term of Agreement. This agreement shall continue for the life of the well field and shall terminate when the well field is no longer productive. Upon termination of the agreement, MCP shall cap the well according to State Law in existence at the time.

(Id. ¶ 5.)

MCP's Indemnification. MCP shall indemnify and hold harmless DeLanghes from and against any and all losses, claims, damages, expenses or liabilities, including without limitation reasonable attorneys' fees, incurred and which arise out of or are based upon any interference with or disturbance of the ability of any other wells to produce water caused by or alleged to be caused by the pumping of the wells by MCP pursuant to this agreement.

(Id. ¶ 6.)

### 3.     Other Well Contracts

In November 1995, the DeLanghes also entered contracts with MCP for other wells on their property, Wells 5 and 8. (Ripley Aff., Exs. 6-7.) In those contracts, MCP also paid one-time payments of $10,000 per well. (Id. ¶ 8.)

4

### 4.     Purchase of MCP

In 2002, Defendant Archer Daniels Midland Company ("ADM") acquired

MCP and took over the Marshall plant.  (Compl. ¶ 12; Answer ¶ 12; Ripley Aff.,

Ex. 2, Untiedt Dep. 19.)  ADM acquired MCP's contractual rights in the Well

Agreement.  (Compl. ¶ 12; Answer ¶ 12.)  The ADM Marshall plant obtains

water from three sources: wells, such as those on the DeLanghes' property,

MMU, and Lincoln Pipestone Rural Water.  (Ripley Aff., Ex. 4, Nelson Dep. 27.)

### 5.     The DeLanghe Trusts

On April 23, 2008, the DeLanghes transferred their interests in the land on

which Wells 1 and 2 were located to the DeLanghe Trusts.  (DeLanghe Aff. ¶ 9.)

### 6.     Failure of Wells 1 and 2

In 2012 or 2013, Wells 1 and 2 began to show signs of diminished

production due to corrosion of the well casings.  (Ripley Aff., Ex. 4, Nelson Dep.

20-21, 29.)  Gaps in the lining allowed rocks and gravel to infiltrate the wells.  (Id.

71.)  ADM determined that it was not possible to simply re-sleeve the existing

holes.  (Id. 29.)  The wells became "unusable."  (Id. 71; Ripley Aff., Ex. 9,

Authorization for Expenditure.)

ADM Utilities Supervisor Tom Nelson then prepared an "Authorization for Expenditure" form in which he sought internal approval to drill replacement wells for Wells 1 and 2 within 20 feet of the original wells.  (Nelson Dep., Ex. 6.)  In the Authorization for Expenditure, Nelson compared the costs of drilling replacement wells to alternatives.  (Id.)  He calculated that it would cost ADM $300,241 to drill the new wells and then $37,843 per year to own and operate them versus $331,128 per year to acquire water from MMU.  (Id.)  In return for a one-time expense of $300,241 to drill two replacement wells, ADM would save $293,285 per year.  (Id.)

Nelson testified that, if ADM continued pumping from Wells 1 and 2 it would cause "a complete failure of that well casing, which could collapse the well and endanger that pipe from being pulled out."  (Nelson Dep. 22.)  By July or August 2013, ADM had stopped operating both Wells 1 and 2.  (Id. 21.)

### 7.     Replacement Well Holes

On April 17, 2013, DeLanghe met three ADM representatives at one of the wells.  (DeLanghe Aff. ¶ 10; Ripley Aff., Ex. 3, Pasquariello Dep. 35-36; Ripley Aff., Ex. 1, DeLanghe Dep. 49.)  The ADM representatives explained that the wells were failing and that ADM wanted to drill new wells.  (Id.)  ADM asserts

that its representatives explained that the replacement wells would be drilled within the boundaries defined in the Well Agreement, about ten feet from the original wells, and that ADM's legal department had decided that ADM had the right to drill the replacement wells.  (Ripley Aff., Ex. 3, Pasquariello Dep. 36.) ADM also stated that, without Wells 1 and 2, the pipeline connected to those two wells would be unproductive, and ADM would likely terminate the pipeline. (Id. 37, 55.)

> One of the ADM representatives gave DeLanghe a letter, which stated:
>
> This letter is to notify you of our intent to drill two replacement wells adjacent to our existing wells 1 and 2.  The new wells will be within the original land description survey of the Well Agreement dated March 28, 1995.
>
> This agreement has been reviewed by Fred Kenney an attorney in our Legal Department.  Mr. Kenney can be reached at [telephone number].

(DeLanghe Aff. ¶ 10; Ripley Aff., Ex. 10.)

DeLanghe objected multiple times to ADM regarding its plan to drill replacement wells.  (See, e.g., DeLanghe Aff. ¶ 11.)

In July and August 2013, over DeLanghe's objections, ADM completed drilling two new wells on the DeLanghes' land.  (DeLanghe Aff. ¶ 12; Ripley Ex., 3, Pasquariello Dep. 28; Ripley Aff., Ex. 4, Nelson Dep. 19.)  The new wells were

approximately 10 to 15 feet from the original wells.  (Ripley Aff., Ex. 4, Nelson

Dep. 37.)   ADM did not relocate any buildings on the well sites as a result of

drilling the replacement wells.  (Nelson Dep. 37-38.)  Despite the DeLanghes'

continued objections, ADM continues to pump water from the new wells.

(DeLanghe Aff. ¶ 13.)

### B.    Procedural History

On December 12, 2013, the DeLanghes, as trustees for the Trusts, filed a

Complaint against ADM in this Court.  The Complaint asserts: Count 1:

Common Law Trespass; Count 2: Statutory Trespass under Minnesota Statute §

548.05; Count 3: Nuisance; Count 4: Unjust Enrichment; Count 5: Conversion;

and Count 6: Civil Theft under Minnesota Statute § 604.14.  The parties have now

filed cross motions for summary judgment.

## III.   DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.      Contract Interpretation

"The primary goal of contract interpretation is to ascertain and enforce the

intent of the parties."  Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359,

364 (Minn. 2009) (citation omitted).  "[W]hen a contractual provision is clear and

unambiguous, courts should not rewrite, modify, or limit its effect by a strained

construction."  Id. at 364-365 (citations omitted).

> When the intention of the parties to a contract is totally
> ascertainable from the writing, construction is for the court.  [The
> Court] construe[s] a contract as a whole and attempt[s] to harmonize
> all clauses of the contract.  Because of the presumption that the
> parties intended the language used to have effect, [the Court] will
> attempt to avoid an interpretation of the contract that would render
> a provision meaningless.

Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 525-26 (Minn. 1990) (citations

omitted).

> The determination of whether a contract is ambiguous is a question
> of law and depends, not upon words or phrases read in isolation,
> but rather upon the meaning assigned to the words or phrases in

accordance with the apparent purpose of the contract as a whole. We give the language of the contract its plain and ordinary meaning and interpret the contract so as to give meaning to all of its provisions.  In construing a contract, our purpose is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract.  Divergent interpretations do not necessarily create ambiguity, especially when an interpretation contradicts the language of the contract.  A contract is ambiguous if, based on its language alone, it is reasonably susceptible of more than one interpretation.

Boat Dealers' Alliance, Inc. v. Outboard Marine Corp., 182 F.3d 619, 621 (8th Cir.

1999) (discussing Minnesota law) (citations omitted).

### C.    Definition of the Term "Wells"

The parties focus on the definition of the terms "wells," "well field," and

"well sites" in the following provisions of the Well Agreement:

> Discontinuance of Operation.  MCP does hereby agree that if at any time these **wells** become non-operational, that MCP at there [sic] expense shall close said **well** according to Minnesota Statutes and regulations in existence at the time of the closure, and remove any and all structures from the **well site**.  Upon removal, all use of the property described in the **well sites** shall revert to DeLanghes.

(Well Agreement ¶ 3 (emphasis added).)

> Term of Agreement. This agreement shall continue for the life of the **well field** and shall terminate when the **well field** is no longer productive.  Upon termination of the agreement, MCP shall cap the **well** according to State Law in existence at the time.

(Id. ¶ 5 (emphasis added).)

### 1.     Whether the Well Agreement Is Ambiguous

The Court concludes that the Well Agreement is unambiguous.  The Well Agreement uses, but does not define, the terms "wells," "well sites," and "well fields."  The only reasonable interpretation of the terms, that gives meaning to all three, is as follows: "wells" refers to the holes themselves and the related machinery required to draw water from the holes; "well sites" means the 100 foot by 100 foot parcels of real estate on which the "wells" were located; and "well field" refers to the water aquifer from which the "wells" drew water.

First, giving words their plain and ordinary meaning, a "well" is "a deep hole made in the ground through which water can be removed."  See, e.g., Merriam-Webster, at http://www.merriam-webster.com/dictionary/well (last visited December 28, 2015).  Although ADM repeatedly refers to "well holes" or "holes" throughout its briefs, the terms "well hole" or "hole" do not appear in the Well Agreement.

Second, the definition of the term "well" as a hole in the ground from which water can be obtained is the definition that makes sense when reading the Well Agreement as a whole.  Paragraph 5 of the Well Agreement refers to "cap[ping]the well."  Only a hole can be capped – an entire aquifer or a plot of land on which the hole sits cannot be "cap[ped]."  Additionally, the Well

Agreement distinguishes between the "well site," which is undisputedly the 100 foot by 100 foot area of land on which the well sits, and the "wells" themselves. When two different terms are used, it is clear that the drafters intended two different meanings.  Moreover, the "well" must be different that the "well field," which all parties agree is the aquifer from which the water is drawn.

ADM repeatedly argues that defining "well" as the hole itself is illogical because, under that definition, any mechanical breakdown would trigger ADM's duty under Paragraph 3 to close the well, remove the surrounding structures, and return the well site to the DeLanghes.  The Court disagrees.  Paragraph 3 is triggered when the "wells become non-operational," not when the wells have a mechanical problem.  "Non-operational" logically means that the well cannot be fixed.  Wells 1 and 2 cannot be fixed.  If ADM could have repaired the casings, then it could have continued to pump from Wells 1 and 2.  But it could not continue to use Wells 1 or 2, no matter what repairs it made.  Thus, Wells 1 and 2 became non-operational.

ADM also claims that there has been no "discontinuance of operation" of the wells under Paragraph 3.  It claims that the intent of Paragraph 3 was to require MCP to return the property to its original condition if ADM abandoned

the wells.  The Court disagrees.  Plaintiffs do not assert that drilling replacement wells constitutes discontinuance of operation of the wells.  Rather, they claim that the land reverts to them when the wells drilled by MCP, Wells 1 and 2, become non-operational, i.e., when it was no longer possible for ADM to operate them.  This undisputedly occurred in 2013: ADM admits that the wells became unusable at that time.

Read together, Paragraphs 3 and 5 mean that, if the two wells become non-operational, "the property described in the well sites" reverts to Plaintiffs, but the Well Agreement itself remains in effect until it is terminated under Paragraph 5.  Paragraph 5 requires ADM to cap the wells and terminate the Well Agreement if the well field – the aquifer – is no longer productive.   If, on the other hand, the wells became non-operational while the well field is still productive, the land reverts to the DeLanghes under Paragraph 3, but the Well Agreement remains in effect for as long as the well field remains productive.

Paragraphs 3 and 5 are separate clauses with different meanings. Paragraph 5 makes no mention of "well sites," and says nothing about when ADM's right to use those well sites terminates.  Rather, Paragraph 5 addresses the termination of the Well Agreement itself.   The only clause that expressly

states when ADM's right to use the well sites ceases in Paragraph 3, under which

"all use of the property described in the well sites shall revert to DeLanghes"

when the "wells become non-operational."

### 2.    Extrinsic Evidence

Because the Court concludes that the Well Agreement is a complete and

unambiguous contract, it will not consider the extrinsic evidence submitted by

the parties.  See, e.g., Telex Corp. v. Data Products Corp., 135 N.W.2d 681, 686-87

(Minn. 1965).  Thus, the Court denies Defendant's motion to supplement,

because the proposed supplemental evidence is not relevant to the Court's

decision.

### D.    Count 1: Common Law Trespass

"In Minnesota, a trespass is committed where a plaintiff has the right of

possession to the land at issue and there is a wrongful and unlawful entry upon

such possession by defendant."  Johnson v. Paynesville Farmers Union Coop. Oil

Co., 817 N.W.2d 693, 701 (Minn. 2012) (citations omitted).   "[B]ecause trespass is

an intentional tort, reasonableness on the part of the defendant is not a defense to

trespass liability."  Id. (citation omitted).  "[A] trespass can occur when a person

or tangible object enters the plaintiff's land."  Id. (footnote and citations omitted).

> [C]onsent to enter upon a particular part of the land of an owner
> does not supply consent to trespass upon any other part of such
> land.  Wrongful conduct following an authorized entry upon the
> land can result in a trespass.  Moreover, although consent may be
> implied from the conduct of the parties, silence alone does not
> support an inference of consent.

N. States Power Co. v. Franklin, 122 N.W.2d 26, 30 (Minn. 1963) (footnotes

omitted).

Plaintiffs are entitled to summary judgment on liability for their common

law trespass claim.  Although ADM had permission to maintain Wells 1 and 2 on

their land, it was not authorized to drill additional wells.  Under the Well

Agreement, once Wells 1 and 2 became non-operational, ADM was required to

"remove any and all structures form the well site."  Even though the DeLanghes

expressly told ADM that it did not have permission to enter their land and drill

new wells, ADM did so and has refused to remove them.

### E.    Count 2: Statutory Trespass

Although Defendants are liable for common law trespass, the Court

concludes that Plaintiffs are not entitled to treble damages under the statutory

trespass statute, because ADM's trespass did not involve the "carry[ing] away"

of their "personal property."  Minn. Stat. § 548.05.  The statute provides:

> Whoever shall carry away, use or destroy any wood, timber, lumber,
> hay, grass, or other personal property of another person, without

> lawful authority, shall be liable to the owner thereof for treble the
> amount of damages assessed therefor in an action to recover such
> damages.  If upon trial, the defendant proves having probable cause
> to believe that such property was the defendant's own, or was
> owned by the person for whom the defendant acted, judgment shall
> be given for the actual damages only, and for costs.

Minn. Stat. § 548.05.

"This statute is highly penal and should receive the strictest construction, and not be extended to cases not within its spirit as well as letter." Berg v. Baldwin, 18 N.W. 821, 822 (Minn. 1884).  The term "other personal property" "should be confined to things 'ejusdem generis' with those enumerated." Id. "[U]nder the canon of statutory construction known as ejusdem generis, where general language follows an enumeration of specific subjects, the general language is presumed to include only subjects of a class similar to those enumerated."  Krech v. Krech, 624 N.W.2d 310, 312 (Minn. Ct. App. 2001).

ADM entered the DeLanghes' land without lawful authority and carried away water that flows under their property.  Water is not "wood, timber, lumber, hay, [or] grass."  The Minnesota Supreme Court has adopted a restrictive definition of "other personal property:" "the phrase 'other personal property' [is] limited to products of the soil or things produced by and grown upon land." Mondt v. Sexter Realty Co., 293 N.W.2d 376, 377 (Minn. 1980) (citation omitted).

Water cannot be said to be "grown upon land."  Nor is water within a class similar to "wood, timber, lumber, hay, [or] grass."  While the Minnesota courts have not defined "products of the soil," the phrase is commonly used to mean plants, trees, and growing things, not water or minerals mined or drilled from the land.  See, e.g., 29 C.F.R. § 780.112 (defining "products of the soil" as "commodities that are planted and cultivated by man."); Marshall, Sec'y of Labor v. Frezzo Bros., Inc., No. 79-196, 1981 WL 27293, at *7 (E.D. Pa. June 12, 1981) (same); Preseault v. United States, 100 F.3d 1525, 1535 (Fed. Cir. 1996) (referring to "the right to harvest the herbage and other products of the soil growing on the right-of-way"); Lacroix v. Comm'r of Internal Revenue, 61 T.C. 471, 488 n.15 (1974) (referring to trees as "crops which are the natural products of the soil").

Given the Minnesota Supreme Court's statement that the trespass statute is "highly penal and should receive the strictest construction," the Court concludes that water does not fit within the definition of "other personal property," and the statutory trespass statute does not apply.  Thus, Plaintiffs are not entitled to treble damages.

## F.    Count 3: Nuisance

"[A] plaintiff who presents evidence that the defendant intentionally maintains a condition that is injurious to health, or indecent or offensive to the

senses, or which obstructs free use of property, states an actionable claim in nuisance." <u>Wendinger v. Forst Farms, Inc.</u>, 662 N.W.2d 546, 552 (Minn. Ct. App. 2003). <u>See</u> Minn. Stat. § 561.01 ("Anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance."). "For an interference with the enjoyment of life or property to constitute a nuisance, it must be material and substantial. A court measures the degree of discomfort by the standards of ordinary people in relation to the area where they reside." <u>Citizens for a Safe Grant v. Lone Oak Sportsmen's Club, Inc.,</u> 624 N.W.2d 796, 803 (Minn. Ct. App. 2001) (citation omitted).

ADM points out that ADM and its predecessor have continuously operated wells on the DeLanghes' property since the early 1990s. It argues that, because its operation of the well sites since 2013 is not materially different than its operation during the previous 20 year, its actions cannot constitute a nuisance. Although ADM had permission to drill and use wells on the well sites at issue on Plaintiffs' land until 2013, it no longer had any right to do so after that time. By drilling and using the replacement wells since 2013, without Plaintiffs' permission, ADM has intentionally maintained a condition on Plaintiffs'

18

property, which obstructs the Plaintiffs' free use of their property. Thus, it has committed nuisance.

### G.    Count 4: Unjust Enrichment

> To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay. [U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.

ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 306 (Minn. 1996) (citations omitted). "Recovery for unjust enrichment may include either costs avoided by a defendant or the net enrichment that the defendant received." Rainbow Play Sys., Inc. v. GroundScape Techs., LLC, 364 F. Supp. 2d 1026, 1040 (D. Minn. 2005) (citing Cooley v. Major Media Mgmt. Corp., 402 N.W.2d 815, 817 (Minn. Ct. App. 1987)).

Because ADM unlawfully drilled the replacement wells and has benefitted from that unlawful conduct by using water from the wells at the DeLanghes' expense, Plaintiffs are entitled to summary judgment on liability for their unjust enrichment claim.

### H.    Count 5: Conversion

Conversion "is defined as an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use and possession." <u>DLH, Inc. v. Russ</u>, 566 N.W.2d 60, 71 (Minn. 1997) (citations omitted). "The elements of common law conversion are (1) the plaintiff has a property interest and (2) the defendant deprives the plaintiff of that interest." <u>Lassen v. First Bank Eden Prairie</u>, 514 N.W.2d 831, 838 (Minn. Ct. App. 1994) (citation omitted). The damages recoverable for conversion are based on "the fair market value of the . . . goods at the time of the conversion, plus interest from that date." <u>Bloomquist v. First Nat'l Bank of Elk River</u>, 378 N.W.2d 81, 86 (Minn. Ct. App. 1985).

Once Wells 1 and 2 became non-operational, ADM was required to close the wells and remove all structures from the well sites. At that point, all use of the property described in the well sites reverted back to Plaintiffs, and ADM had no claim of right to the water. Thus, ADM is liable for conversion for taking water from the replacement wells.

## I.    Count 6: Civil Theft under Minnesota Statute § 604.14

Under Minnesota's civil theft statute, "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value

when stolen, whichever is greater." Minn. Stat. § 604.14, subd. 1. "There is

limited authority examining Minnesota's civil theft statute," so "courts rely on

the criminal theft statute to determine whether a defendant's conduct amounted

to theft." Damon v. Groteboer, 937 F. Supp. 2d 1048, 1076 (D. Minn. 2013)

(citations omitted).

Minnesota's criminal theft statute "defines theft to include a wide range of

conduct, such as 'intentionally and without claim of right' taking, using,

transferring, concealing or retaining possession 'of movable property of another

without the other's consent and with intent to deprive the owner permanently of

possession of the property." Strei v. Blaine, 996 F. Supp. 2d 763, 792-93 (D. Minn.

2014) (quoting Minn. Stat. § 609.52, subd. 2(1)). "Property means "all forms of

tangible property, whether real or personal, without limitation including . . .

water. . . ." Minn. Stat. § 609.52, subd. 1(1). "Movable property" means

"property whose physical location can be changed, including without limitation

things growing on, affixed to, or found in land." Id., subd. 1(2).

Once Wells 1 and 2 became non-operational, ADM was required to close

the wells and remove all structures from the well sites. At that point, all use of

the property described in the well sites reverted back to Plaintiffs, and ADM had

no claim of right to the water.  Also, the water taken was movable property

under the civil theft statute.  Thus, ADM is liable for civil theft.

In sum, Plaintiffs have demonstrated that they are entitled to summary

judgment on liability for all of their claims with the exception of statutory

trespass.  The Court now turns to Plaintiffs' damages request.

### J.     Damages

The Court denies summary judgment on damages.  Plaintiffs' damages

theory is fundamentally flawed, and, on the current record, there is insufficient

evidence for the Court to calculate damages as a matter of law.

### 1.     Expert Damages Reports

### a)     The DeLanghes' Expert Report

The DeLanghes' hired Keven Meeks, Certified General Real Property

Appraiser, as a damages expert in this matter.  (See C. Anderson Aff., Ex. G,

Meeks Report.)  Meeks used ADM's projected internal savings in its 2013

"Authorization for Expenditure," applied a discount rate of 8%, and projected

that the replacement wells would be operational for 35 years.  Meeks concluded

that, as of December 12, 2013, ADM had unjustly received benefits of

$3,816,715.00, based on future cost savings from not using municipal water for

the 35-year life of the replacement wells.

### b)   ADM's Expert Report

ADM hired Farryl Kluis, Certified General Appraiser, as an expert in this case.  (See Ripley Aff., Ex. 14, Kluis Report.)  Kluis appraised the value of the two DeLanghe properties on which Wells 1 and 2 were located in 1995 and in 2013, after the replacement wells were drilled.  Kluis opined that the North Parcel was valued at $139,000 in 1995 and $1,010,000 in 2013.  The South Parcel was worth $270,000 in 1995 and $1,785,000 in 2013.

> Kluis concluded:

> [I]t is my finding that the impact of the two wells on the value of the land is insignificant in both 1995 and 2013.  The payment of $10,000 per well in 1995 was more than sufficient.  The presence of the water wells on the parcels, and ADM's continued use of those wells, has no adverse impact on the value of the land.

(Kluis Report at 2.)

### 2.   Future Damages

The Court rejects Plaintiffs' damages calculations.  Plaintiffs' damages calculation is based on the anticipated benefit to ADM from using water from the two replacement wells for the next 35 years.  This analysis is not based on any loss that Plaintiffs have already suffered.  Instead, it assumes cost savings that ADM would realize more than 30 years in the future.

Prospective damages are only proper if "it is shown with reasonable certainty" that the future damages will result. <u>Ziebarth v. Nye</u>, 44 N.W. 1027, 1028 (Minn. 1890). Thus, for example, in <u>Gulf, C. & F. Ry. Co. v. Moseley</u>, the defendant had erected dikes that could not and would not be removed, yet the dikes caused annual flooding to the plaintiff's land and made that land almost worthless. 161 F. 72, 74-75 (8th Cir. 1908). The Eighth Circuit held that the plaintiff was "required to recover in one suit the entire damages, present and prospective, caused by the defendant's act." <u>Id.</u> at 75. "Injuries caused by permanent structures infringing upon the plaintiff's rights in his land, such as railroad embankments, culverts, and bridges, permanent dams, and permanent pollutions of water" fall into a class of cases for which only "one action is allowed." <u>Id.</u> (citation omitted).

Here, Plaintiffs are not seeking damages for a single permanent trespass that has occurred. Instead, they request damages for trespass that they predict ADM will commit for 35 years into the future. Yet ADM represents that, if this Court rules against it, it will immediately stop pumping water from the replacement wells. This is not a case like the environmental contamination cases cited by Plaintiffs in which damages from pollutants already in the ground will

24

continue to affect the land into the future.  Cf. Union Pac. R.R. Co. v. Reilly

Indus., Inc., 4 F. Supp. 2d 860 (D. Minn. 1998), aff'd, 215 F.3d 830 (8th Cir. 2000).

Here, ADM can easily stop taking water, close the replacement wells, and

remove the structures from the well sites, so that future damages will be

avoided.  Additionally, unlike in cases such as Ziebarth, here, there is no

evidence in the record that ADM's trespass has had an adverse impact on the

value of Plaintiffs' land.

Accordingly, based upon the files, records, and proceedings herein, **IT IS

HEREBY ORDERED**:

1.      Defendant's Motion for Summary Judgment [Docket No. 21]
        is **DENIED**.

2.      Plaintiffs' Motion for Summary Judgment [Docket No. 26] is
        **GRANTED IN PART** and **DENIED IN PART** as follows:

        a)      Count 2: Statutory Trespass under Minnesota Statute §
                548.05 is **DISMISSED**.

        b)      Summary judgment as to liability is **GRANTED** as to
                Counts 1, 3, 4, 5, and 6.

        c)      Summary judgment is **DENIED** as to damages.

25

3.     Defendant's Motion to Supplement [Docket No. 46] is
       **DENIED**.


Dated:  January 12, 2016            s/ Michael J. Davis
                                    Michael J. Davis
                                    United States District Court